STATE of North Dakota, Plaintiff and Appellee,

v.

Herbert O. JENSEN, Defendant and Appellant.

Crim. No. 554–C.

Supreme Court of North Dakota.

July 18, 1979.

Rehearing Denied Aug. 2, 1979.

Clifford C. Grosz, former Wells County State's Atty., Harvey, and Calvin N. Rolfson, former Asst. Atty. Gen., Bismarck, for plaintiff and appellee at trial in lower court; Aloys Wartner, III, Wells County State's Atty., Harvey, and Gail Hagerty, Asst. Atty. Gen., Bismarck, for plaintiff and appellee on appeal; argued by Gail Hagerty.

Irvin B. Nodland, of Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, and Robert J. Snyder, of Bickle, Coles & Snyder, Bismarck, for defendant and appellant; argued by Irvin B. Nodland.

ERICKSTAD, Chief Justice.

This is the fourth time we have considered matters involving Herbert O. Jensen. *See State v. Jensen,* 265 N.W.2d 691 (N.D.1978); *State v. Jensen,* 241 N.W.2d 557 (N.D.1976); and particularly *State v. Jensen,* 251 N.W.2d 182 (N.D.1977), for background information leading to this appeal.

More specific facts relative to the issues in this case follow:

Between 3:30 a. m. and 4:00 a. m. on November 16, 1974, a passing motorist discovered the bodies of two deceased male American Indians lying on the shoulder of U.S. Highway 52, approximately four miles west of Harvey, North Dakota. The bodies were subsequently identified as Dale Abraham and Ernest Vivier, both of the Devils Lake area, and an autopsy disclosed that both victims died of gunshot wounds.

A number of law enforcement personnel were summoned to the scene as well as an ambulance and the county coroner. One of the officers on the scene, Deputy Sheriff Curtiss Pellett of Wells County, recognized the bodies as being persons he had seen earlier in the evening at a bar in Fessenden, North Dakota. Pellett recalled that the decedents had been in the company of a white male and a description of this person and the car in which he was believed to be traveling was immediately broadcast on the law enforcement network. While transporting the bodies to Minot for an autopsy, the ambulance passed a vehicle that matched the description of that being sought by the law enforcement officers parked on the shoulder of U.S. Highway 52, approximately two miles west of Balfour, North Dakota, or approximately 30 miles northwest of where the bodies were found.

The ambulance driver gave this information to state radio, and officers Arden Johnson and L. A. Fontaine of the State Highway Patrol subsequently arrived at the scene.

They found the defendant, Herbert Jensen, slumped over the steering wheel in the driver's seat, apparently asleep. The officers read Jensen his rights and placed him under arrest.

In Jensen's vehicle, the officers found a billfold of one of the victims, blood, a wine bottle containing a fingerprint of one of the victims, and Jensen's pistol, which a subsequent ballistics test identified as the weapon that inflicted the lethal wounds.

At the trial it was disclosed that Jensen, a retired veteran of the United States Air Force, left Fargo, bound for Minot, North Dakota, on November 15, 1974, after being released from the Veterans Administration Hospital on that day with supplies of tranquilizers and other drugs. At Pingree, North Dakota, about 20 miles north of Jamestown, Jensen picked up Vivier and Abraham, who were hitchhiking. He treated them to hot brandy and wine at three different establishments, leaving the third one at about 1:00 a. m. on November 16, 1974. The trio also consumed two bottles of wine while driving.

Jensen testified that he remembered almost nothing of what happened after he and the decedents left the last bar at which they stopped until being awakened by the police in his parked car. The part of his testimony pertinent to his memory after leaving the Artos Supper Club near Harvey at about 1:00 a. m. follows:

"As near as I can recollect at this time I was driving down the highway; I heard a voice loud and clear asking or demanding something of me. I have the impression that there was a threat on my life. I have the impression of my head going forward twice; that I seen stars at this time. I had the impression of being panic —scared. I had the impression of defecating and urinating in my pants. I had all these emotions of fear and anger all at once arising. I have the impression of something looming over me. I have the impression of laying objects out onto the ground. I have the impression of going down a hall and going into someone's apartment and was so ashamed because it was an elderly couple's home—they were dressed in night attire. I remember feeling ashamed about this because I didn't knock or have the courtesy. The next recollection that was clear that I had was being awakened by Officer Fontaine the next morning about dawn."

After a trial lasting approximately two weeks, the jury, on October 19, 1977, found Jensen guilty of two counts of murder in the second degree. Jensen was subsequent-

ly committed to the North Dakota State Penitentiary for the term of two concurrent thirty-year sentences pursuant to the classification of the defendant as a special dangerous offender. Jensen appeals to this court from the jury verdicts of guilty and the judgments and sentences of the court.

In this appeal there are two issues: (1) whether or not there is substantial evidence to justify the two verdicts of guilty, and (2) whether or not the trial court erred in receiving certain evidence concerning a prior altercation between Jensen and one Al Kontos.

The first issue, counsel asserts, should be decided in favor of Jensen because the deaths occurred while Jensen was either (a) intoxicated, or (b) insane, or (c) in self-defense.

Let us first consider the defense of intoxication. At the time of the alleged murders, the Legislature had enacted the new criminal code, but its effective date had not been reached. Jensen was thus charged and tried under the homicide provisions of the old criminal code, which read as follows:

"12–27–08. *'Murder' defined.*—Homicide is murder in the following cases:

"1. When perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being;

"2. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, in disregard of human life, although without any premeditated design to effect the death of any particular individual; and

"3. When perpetrated without any design to effect death by a person engaged in the commission of any act or omission which may be punished by imprisonment in the penitentiary under any law of this state without regard to the punishment actually imposed."

"12–27–11. *Murder divided into two degrees.*—According to the facts and circumstances attending the killing, or as specially declared by law, murder is either:

"1. Murder in the first degree; or

"2. Murder in the second degree."

"12–27–12. *Degrees of murder defined.*—Every murder perpetrated by means of poison, or by lying in wait, or by torture, or by other willful, deliberate, or premeditated killing, or in committing or attempting to commit any sodomy, rape, mayhem, arson, robbery, or burglary, is murder in the first degree. All other kinds of murder are murder in the second degree."

At the time of trial, the effective date of the new criminal code having been reached, Jensen elected pursuant to Section 12.1–01–01, N.D.C.C., to be tried under the defense and sentencing provisions of the new criminal code. The pertinent section relative to the defense of intoxication is:

"12.1–04–02. *Intoxication.*—1. Intoxication is a defense to the criminal charge only if it negates the culpability required as an element of the offense charged. In any prosecution for an offense, evidence of intoxication of the defendant may be admitted whenever it is relevant to negate the culpability required as an element of the offense charged, except as provided in subsection 2.

"2. A person is reckless with respect to an element of an offense even though his disregard thereof is not conscious, if his not being conscious thereof is due to self-induced intoxication."

Under the old criminal code, Section 12–27–08, N.D.C.C., both the State and the defense seem to agree that an essential element of the crime of murder in the second degree is malice, either express or implied. *State v. Carter*, 50 N.D. 270, 195 N.W. 567 (1923). That being the case, it is asserted by counsel for the defense that if Jensen, through the effects of alcohol, was unable to harbor malice at the time of the alleged killings, the element of culpability was not present and accordingly he could not be found guilty.

Counsel for the defense asserts that the evidence in this case shows that, after having picked up the two decedents, Jensen stopped in three bars and consumed alcohol in each and that he also participated in the drinking of two bottles of wine while driving. He further asserts that the evidence shows that at the time of the killings, in addition to consuming alcohol, Jensen was also taking prescriptions for several drugs, the most notable of those being valium. He points out that Dr. Daniel Nusbaum, a defense psychiatrist, testified that valium tends to aggravate the effects of alcohol, and that according to Nusbaum the combined effects of valium and alcohol consumed by the defendant on the night of the killings would have been equivalent to eight shots of whiskey.

Actually, Jensen testified that on the 15th of November, 1974, the day on which he left the V.A. Hospital in Fargo and journeyed to Jamestown and ultimately picked up the two decedents as hitchhikers near Pingree, North Dakota, that he took no valium after 5:00 or 5:30 p. m. on that date. The bodies of the decedents were found along highway 52 between Harvey and Martin between 3:30 and 4:00 a. m. on November 16, 1974, by Emanuel Volk who was enroute from Knox, North Dakota, to

his home at Martin, North Dakota. Jensen was seen entering his red Volkswagen stationwagon and driving away from the Artos Supper Club near Harvey, North Dakota, with the decedents at about ten minutes to 1:00 in the morning of November 16, 1974, by Albert Wentz of Harvey.

On cross examination by counsel for the defense, Wentz was asked this question: "Were the walk and the conduct of the people you saw, Mr. Jensen and the two people with him, such that you thought there was anything other than ordinary about it?" He answered: "No. It seemed like they walked okay to me."

Counsel for Jensen asserts that Dr. Hubert Carbone, the psychiatrist called by the prosecution, testified that it was his opinion that Jensen may very well have consumed sufficient alcohol and drugs to impair his ability to understand and to have an intent to do the things that he did.

To arrive at this conclusion, counsel had to rephrase what Dr. Carbone said at pages 888 and 889 of the transcript.

We believe that the jury, however, could have arrived at a completely different view of Dr. Carbone's view after listening to that part of his testimony which is covered by pages 878 to 880.[1]

1. "Q. Dr. Carbone, are you familiar with the law of this State that permits in some limited circumstances that may or may not be applicable to this case, that permits a defense of self-induced intoxication if that intoxication can be shown to negate the required elements of culpability?

"A. Yes.

"Q. With respect to that defense, and based upon your history of the defendant, I would like to ask you a hypothetical question and ask for your conclusion. To do this I am going to set the stage with some facts that have already been presented in evidence in this case and would ask you to listen to those and then I will ask you a question.

If a person claims to be so intoxicated that he could not form any necessary intent to commit a crime, if in fact that should be the case under the law, and he claims to have blacked out, when he also recalls a number of things during this blackout period, a number of which are as follows: that he drove a car at a specific speed, that he recalls driving a car, that he recalled someone talking to him, he recalled someone asking something or telling him something, he

recalls that someone by a specific name had asked for something, he recalls being startled, moving his head forward twice; he recalls feelings of anger, fear, panic and rage; he recalls his bowels moving improperly; he recalls putting two victims in a certain position on the ground; he recalls placing one in a specific easterly direction and another in a westerly direction or northerly direction; he recalls going down a long corridor; he recalls seeing two people; he recalls that those two people are one a male and the other a female; he recalls them being elderly; he recalls them wearing night clothes; he recalls certain specific feelings of shame and disgust from seeing them and disturbing those old people; and he recalls leaving that corridor. My question is, with those admitted recollections in mind, and based upon your training and experience as a psychiatrist, is it medically probable that the defendant was so intoxicated that he could not form any criminal intent at that time?

"A. In my opinion the answer is no.

"Q. Can you explain why?

"A. If he were sufficiently intoxicated so that he had lost the capacity to control his actions

The essence of that testimony is that Dr. Carbone concluded that Jensen did not lack substantial capacity to appreciate the criminality of his conduct, notwithstanding that he may have consumed intoxicating liquors.

In this case, the trial court gave an instruction to the jury on the defense of intoxication.[2] It has not been asserted by defense counsel that the instruction was erroneous. We assume that the issue of intoxication was argued by defense counsel to the jury and we accordingly conclude that the jury properly met and decided that issue.

■ Intoxication as a defense was an issue for the jury. There was ample evidence to substantiate the verdict of the jury from which it can be inferred that the jury concluded that Jensen was not so intoxicated at the time he took the lives of the two hitchhikers that he did not have the intent necessary to commit the crime of second degree murder.

In instructing the jury on the essentials of the offense of murder in the second degree, the court, among other things, instructed the jury that the burden of proof resting upon the State is satisfied only if the evidence shows, beyond a reasonable doubt, "that the defendant, with malice and in disregard of human life, although without any premeditated design to effect the death of any particular individual, perpetrated the killing of an individual by means of one or more bullets discharged from a firearm, an act imminently dangerous to others and evincing a depraved mind." We may properly assume that the jury, when considering the elements of the offense, took into consideration the requirement of malice in conjunction with Jensen's defense of intoxication and the instructions on intoxication.[3]

In *People v. Cheary*, 48 Cal.2d 301, 309 P.2d 431 (1957), the California Supreme Court, in a decision written by Justice Traynor, affirmed a conviction of murder in the first degree where the defendant argued that the evidence established that he was so intoxicated that he did not have the specific intent to commit rape and that therefore the death resulting could not be murder in the first degree, saying this was a matter for the jury. We likewise so conclude in this case.

The second defense argued within the issue of the sufficiency or the insufficiency

or to conform to the law, he would not have been capable of specific and clear recollections as you stated in your hypothetical question. "Q. Okay. With those additional facts in mind if they should be found to be true or have been admitted, does that affect your diagnosis of the defendant as you had stated earlier that if he was so intoxicated that certain things could have happened to him or in that area— would you explain that, please, with that additional information? "A. With that additional information, if that were true, would change my opinion to the extent I would now be of the opinion that he was not sufficiently intoxicated at the time to impair his capability of controlling his behavior. "Q. Is it your opinion then, based upon that additional information, that the defendant did not lack substantial capacity to appreciate the criminality of his conduct? "A. Yes. "Q. Is it also your opinion with that additional information that at the time in question, of these offenses, that the defendant was not suffering from a mental disease or defect and could control his—did appreciate the criminality of his conduct?

"A. Yes."

2. "Intoxication is a defense to the criminal charge only if it negates the culpability required as an element of the offense charged.

"For your information the words 'negate' and 'culpability' used above are defined as follows: "'Negate' means to deny, contradict, or rule out. "'Culpability' means fault or blameworthiness.

"If you find the intoxication, which is claimed by the defendant in this case, to be such that it rules out the fault or blameworthiness of his act, or if you have a reasonable doubt in this respect, in that event your verdict must be not guilty."

3. For background on the defense of intoxication, *see* "Working Papers of the National Commission on Reform of Federal Criminal Laws", Vol. I, July 1970, pp. 223–25; and the Final Report of the National Commission on Reform of Federal Criminal Laws, Proposed New Federal Criminal Code, 1971, § 502 Intoxication, pp. 38 and 39; and Voluntary Intoxication—Defense, 8 A.L.R.3d 1236 (1966).

of the evidence to support the verdict which we shall consider is the defense of self-defense.

Pursuant to the provisions of Section 12.-1–01–01, N.D.C.C., Jensen elected to come under the provisions of Chapter 12.1, N.D. C.C., providing a defense, and thus contends that under the defense of self-defense contained in Section 12.1–05–03, N.D.C.C., he should be absolved in this case.[4]

Jensen relies upon the testimony of a number of people who observed Abraham and Vivier during the last few days of their lives and of some who had known them over the last 10 years of their lives in support of his argument that the lives of Vivier and Abraham were taken in self-defense. We quote from his brief as follows:

"Mural Pollert, called as a defense witness, testified that the two decedents had been at his elevator in Pingree, North Dakota, the evening of November 15, 1974. He testified that they had been drinking, demanded a ride, and became hostile when he refused to give them one. One of them brandished a wine bottle and declared it to be his weapon. Mr. Pollert stated that he was frightened by the two men.

"Ronald Cumber testified that the two entered his gas station on the evening of November 15, 1974. They demanded a ride, and when refused, one of them flipped up an empty shotgun shell and stated that if it were real and he had a gun he would shoot Mr. Cumber. Mr. Cumber stated that he was frightened by the two men.

"Randy Jones, a Jamestown Policeman, testified that on the early evening of November 15, 1974, he picked up the two decedents drinking in the Jamestown train station and gave them a ride to the edge of town.

"Donald Summers, formerly a police officer for the Devils Lake Police Department, stated that he personally knew both Dale J. Abraham and Ernest Vivier, and that both became aggressive and belligerent with the use of alcohol.

"Romona Chaske, the Clerk of Court for the Fort Totten Indian Reservation, testified from Court records that during the prior ten years Dale J. Abraham had been involved in two disorderly conducts, six public intoxications, two liquor violations, a malicious mischief, and two assaults and battery.

"During the same time period Ernest Vivier was involved in a public intoxication and a disorderly conduct.

"Allan Gustafson, a Deputy Sheriff, testified that he knew both decedents for a number of years, and that both had reputations for turbulence and violence.

"Gerald Klosterman, a Jamestown policeman, testified that the day before the shootings he was called to a cafe in Jamestown, where the decedents were involved in an altercation. Both men were held for detoxification, and Mr. Vivier was particularly intoxicated and belligerent.

"David Walford, formerly a Deputy Sheriff in Devils Lake, testified that during the prior ten years he had personally arrested Mr. Vivier at least three times, and had seen him in custody a number of other times for drunkenness and disorderly conduct. He further testified that he

---

4. "12.1–05–03. *Self-defense.*—A person is justified in using force upon another person to defend himself against danger of imminent unlawful bodily injury, sexual assault, or detention by such other person, except that:

"1. A person is not justified in using force for the purpose of resisting arrest, execution of process, or other performance of duty by a public servant under color of law, but excessive force may be resisted.

"2. A person is not justified in using force if:

    a. He intentionally provokes unlawful action by another person to cause bodily injury or death to such other person; or

    b. He has entered into a mutual combat with another person or is the initial aggressor unless he is resisting force which is clearly excessive in the circumstances. A person's use of defensive force after he withdraws from an encounter and indicates to the other person that he has done so is justified if the latter nevertheless continues or menaces unlawful action."

had personally arrested Mr. Abraham during the prior ten years approximately six times for the same offenses. Finally, he testified that Mr. Vivier, while in custody, caused problems in the cellblock by making homosexual advances to the other prisoners and had to be placed in a cell by himself.

"The defendant, himself, testified that on the night of the shootings his recollection was of a demand being made, and of his head going forward and seeing stars.

"Doctor John C. Smith testified that during the autopsies of the deceased men a blood alcohol sample was taken from each, and blood alcohol content tests were administered to each sample. The results of these tests showed that at the times of their deaths Ernest Vivier had blood alcohol content of 0.24 percent and Dale J. Abraham had a blood alcohol content of 0.25 percent.

"Finally, Hildegard Heydt testified that on the night of the shootings, at 4:00 to 4:30 a. m., she and her husband awoke to find the defendant standing in the private living quarters of their motel in Drake, North Dakota. When questioned as to his name, the defendant stated that he didn't know, that he needed help, and to call the sheriff; this latter request was repeated several times. The defendant further stated that he had shot two people. The defendant then left the motel."

The State, in response to these arguments on self-defense, asserts that there are limits on the use of force, even in self-defense, and refers us to Section 12.1–05–07, N.D. C.C.[5]

The record discloses that Jensen admitted that from the time he picked up the decedents Vivier and Abraham and until the time his vivid memory lapsed, the decedents made no threatening gestures toward him and that he did not feel threatened by them.

The State contends that the assertion of self-defense is based solely on evidence concerning the characters of the decedents and their propensity for violence especially when intoxicated. Incidentally, there is nothing in the record to indicate that Jensen had any knowledge of decedents' propensity for violence. This evidence was coupled with Jensen's testimony that on the night of the shootings, his recollection was of a demand being made, and of his head going forward and of seeing stars.

The State stresses the fact that the jury was permitted to take account of the fact that Jensen had, from the time he left Jamestown and during the time that he was in the company of the two decedents, a loaded pistol in a shoulder holster strapped underneath his left arm concealed from view.

Although the State did not in argument in this court stress the testimony of Dr. John C. Smith II, a pathologist who examined the bodies of Abraham and Vivier, we think his testimony may have been of significance to the jury on the issue of self-de-

---

5. "12.1–05–07. *Limits on the use of force—Excessive force—Deadly force.*—1. A person is not justified in using more force than is necessary and appropriate under the circumstances.

  2. Deadly force is justified in the following instances:

  \*    \*    \*    \*    \*    \*

  b. When used in lawful self-defense, or in lawful defense of others, if such force is necessary to protect the actor or anyone else against death, serious bodily injury, or the commission of a felony involving violence. The use of deadly force is not justified if it can be avoided, with safety to the actor and others, by retreat or other conduct involving minimal interference with the freedom of the person menaced. A person seeking to protect someone else must, before using deadly force, try to cause that person to retreat, or otherwise comply with the requirements of this provision, if safety can be obtained thereby. But, (1) a public servant justified in using force in the performance of his duties or a person justified in using force in his assistance need not desist from his efforts because of resistance or threatened resistance by or on behalf of the person against whom his action is directed; and (2) no person is required to retreat from his dwelling, or place of work, unless he was the original aggressor or is assailed by a person who he knows also dwells or works there." § 12.1–05–07(1), (2)(b), N.D.C.C.

fense. His testimony was that Abraham was shot twice in the left chest and that a third shot entered near the left pocket on his buttocks area. He further testified that Vivier was shot twice in the back, the one being the fatal wound and the other being a soft tissue wound.

Dr. Smith also testified as to the alcoholic contents of the blood of Vivier and Abraham, saying that Vivier had .24 percent alcohol by weight in his blood, and that Abraham had .25 percent alcohol by weight in his blood.

■ Whether or not Jensen acted in self-defense was a jury question and we believe that from the verdicts of the jury finding Jensen guilty of second degree murder in connection with the death of Vivier and Abraham, the jury concluded that he did not act in self-defense. Our view of the evidence, some of which we have related here and some of which we have not, causes us to believe that the jury had substantial evidence upon which to conclude that Jensen did not act in self-defense. The jury may have completely rejected the possible inference from Jensen's vague recollections that he acted in self-defense, and this is within the province of the jury.

The third defense we shall consider, asserted in conjunction with the issue of the sufficiency or insufficiency of the evidence to support the verdict, is the defense of insanity. Again, under the election provision of Section 12.1–01–01, N.D.C.C., Jensen elected to come under the provision of Section 12.1–04–03, N.D.C.C., which reads:

"12.1–04–03. *Mental disease or defect.* —A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. 'Mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. Lack of criminal responsibility under this section is a defense."

Counsel for Jensen points out that two psychiatrists, Dr. Sherman Severson of Rugby, North Dakota, and Dr. Daniel Nusbaum of Minot, North Dakota, both found Jensen to be suffering from the phenomenon known as pathological intoxication at the time of the shootings.

Quoting from Noyes' and Kolb, Modern Clinical Psychiatry, Dr. Severson read as follows:

"Pathological intoxication. Occasionally an individual of unstable personality may, on partaking of alcohol, suffer from a transitory mental state much more striking in the nature and severity of the symptoms than ordinary drunkenness. The onset is dramatically sudden. Consciousness is impaired, and the patient is confused and disoriented and suffers from illusions, hallucinations of sight, and transitory delusions. Activity is exaggerated, impulsive, and aggressive, even to the point of destructiveness. The emotional disturbances are profound and may consist of rage, anxiety, or depression, perhaps with suicidal attempt. The disorder lasts from a few minutes to a day or more and is usually followed by a prolonged sleep, after which there is an amnesia for the episode."

Upon concluding his reading of the symptoms that exist with pathological intoxication, he compared the textbook symptoms with Jensen's situation prior to, during, and following the shootings.

Dr. Carbone, who was called on behalf of the State in rebuttal, who is also a psychiatrist and who has been the superintendent of the State Hospital since 1963, testified that his opinion was that Jensen was not suffering from a mental disease or defect at the time of the shootings.

When asked to explain why he believed the diagnosis made by the other two psychiatrists of pathological intoxication was incorrect, he explained:

"Mr. Jensen's history indicates that he has been a heavy user of alcohol for many years. He stated in his conversations with me that he used a brandy and several glasses of wine. In accordance with the definitions I have read in these texts

it is clear that Mr. Jensen was able to tolerate alcohol, sometimes using it to excess. It is a contradiction in terms to on the one hand say that he was idiosyncratically allergic to a small amount of alcohol and simultaneously say that he is capable of drinking socially, moderately, or heavy."

During Dr. Carbone's testimony, he relied on a number of textbooks, including the textbook on Specialties in General Practice, edited by Dr. Cecil, Professor of Clinical Medicine, Emeritus, Cornell University Medical College, New York City. The quote from page 563 thereof, reads:

"Pathologic intoxication may occur with small amounts of alcohol. Unlike delirium tremens, in pathologic intoxication there is generally no history of drinking over an extended period prior to the outbreak of the psychosis, and the absence of a previous prolonged bout of heavy drinking serves as a differential diagnostic point."

Although counsel for the defense indicated that Jensen's psychiatrists each spent three to four hours interviewing Jensen personally in contrast to the half an hour which Dr. Carbone apparently spent interviewing Jensen personally, Dr. Carbone defended his opinion on the basis that with the aid of his staff at the hospital, Jensen was observed over a 16-day-period and that the advantage in that type of a process is that the one being examined does not feel that he is under specific examination which results in a more "comprehensive and global evaluation."

Dr. Nusbaum testified that "no one in this room, perhaps other than myself, could, in my opinion, cook up a mass of symptoms that would indicate they had an organic disease of the brain." Dr. Carbone testified, "I think anybody who is intelligent and studied can easily describe symptoms to fit the picture."

Dr. Awad Ismir, a psychologist, when testifying concerning certain tests which he gave Jensen, said:

"In terms of intelligence on the Wechsler Adult Intelligence Scale, he obtained a full scale I.Q. of 128, which places him at the very superior level of intelligence or in the fifth percentile in the nation. On this particular test, which measures eleven different areas of intelligence, he scored in the superior range on every single subtest. His comprehension, memory, abstract thinking, all fall within the very superior range. I did not find any intellectual impairment on the intelligence tests."

In light of the amount of the alcohol ingested by Jensen and the fact that not only Dr. Carbone but also Dr. Severson testified that pathological intoxication occurs after minimal ingestion of alcohol, we believe that the jury could very reasonably have concluded that Jensen was not suffering from pathological intoxication at the time of the shootings.

In conjunction with all three defenses, we think what we have recently said in *State v. Olmstead*, 246 N.W.2d 888, 890 (N.D.1976), is pertinent in this case.

"Appellate courts have stated in many ways, in both civil and criminal cases, their determination to give respect to the findings of trial judges and juries. Sometimes they say they will not reverse if there is substantial evidence to support the verdict [*Kresel v. Giese*, 231 N.W.2d 780, 791 (N.D.1975)]; sometimes they say they will not substitute their judgment for that of the trial court or jury [*State v. Champagne*, 198 N.W.2d 218, 226 (N.D. 1972)]; sometimes they speak of viewing the evidence in the light most favorable to the judgment [*State v. Neset*, 216 N.W.2d 285, 290 (N.D.1974)]; and sometimes they speak of their great reliance on the findings of the lower court [*In re Estate of Elmer*, 210 N.W.2d 815, 819 (N.D.1973)].

"In criminal cases we have repeatedly held that 'at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' *State v. Kaloustian*, 212 N.W.2d 843, 845 (N.D.

1973), and cases cited therein; *State v. Neset,* 216 N.W.2d 285, 287 (N.D.1974).

"However stated, these rules indicate a recognition that the truth can better be determined in the confrontation of the testimony of witnesses appearing in person than from a transcript of the testimony of those witnesses."

Having concluded that none of the three defenses are meritorious, we must conclude that the contention that the evidence is insufficient to support the verdict is also without merit.

We are now left with the final issue which is the issue over whether or not the trial court erred in receiving certain evidence concerning a prior altercation between Jensen and one Al Kontos in the City of Minot during May of 1974.

Counsel for the defendant admits that the first references to this incident were from the mouths of defense witnesses.

The first reference was during the testimony of the first defense psychiatrist, Dr. Sherman Severson of Rugby. In relating the medical history, Dr. Severson said:

"I asked him also that—about specifically if he had any legal difficulties previous to this incident and he did describe an incident where he was charged for assault; he said he was driving down the road and he was nearly run off the road by a person he did not recognize at the time. He said he followed the person, began fighting with him, and hit the person on the head with a wrench, and he was charged with assault. He was fined $50 for that. He denied any other legal difficulties."

The second reference was during the testimony of the second defense psychiatrist, Dr. Daniel Nusbaum, of Minot. During the recitation of Jensen's medical history, Dr. Nusbaum said:

"He related to me a couple of instances in which he had been involved in—some type of—in which he had certain physical altercations within the last year or two years in or around Minot, in which someone did something to aggravate him—one

fellow practically ran him off the road when he was driving his car, the other fellow came around him, they had an altercation, and the other fellow ended up getting hit after apparently he had struck Herb. That is what my report indicates and what he told me."

The third reference to this incident was made by Jensen himself during cross-examination by the State.

"Q. Do you recall being involved in a fight in Minot, North Dakota, with a person by the name of Al Kontos?

"A. I believe Dr. Severson described that incident in his report.

"Q. Would you relate your recollections of what happened there?

"A. As I related to Dr. Severson, this man forced me off the road and we got into a fight in the parking lot; I struck Mr. Kontos with a crescent wrench because he hit me in the face with his fist.

"Q. Did he hit you first?

"A. Yes, that is correct.

"Q. And you had a crescent wrench?

"A. This was my report that I have, yes.

"Q. Other than Mr. Kontos' fist, did he have any weapon?

"A. Other than a very hard fist.

"Q. Did this fight occur where Mr. Kontos forced you off the road?

"A. This occurred in a public parking lot.

"Q. Was that where you were forced off the road?

"A. No.

"Q. What did you do after, as you say, this person forced you off the road?

"A. I told Dr. Severson I followed this man, tried to get his license, and stopped in a parking lot.

"Q. You pursued him then?

"A. I followed him, yes.

"Q. Did you ever bump into his car with your car while both cars were moving as you were following him?

"A. No."

Note that this cross-examination took place without objection from defense counsel.

It is contended that prejudicial error occurred when the court permitted the State, on rebuttal, to call two witnesses for the express purpose of going into greater detail relative to this prior incident in the City of Minot between Jensen and Al Kontos.

The first such witness called was Michael Knoot, a Minot police officer, who apparently was summoned by someone who observed the altercation.

Officer Knoot testified that when he arrived on the scene the first thing he saw was Jensen standing and Mr. Kontos on his knees holding onto Jensen telling him to stop. He further testified in detail as to the injuries suffered by Mr. Kontos.

The second rebuttal witness called in relation to this incident was Al Kontos. Kontos testified in effect that on the day in question he made a left hand turn with his car in front of the car being driven by Jensen. That Jensen then began following him and ramming the back end of his car.

Part of the testimony relating what subsequently transpired, follows:

"A. I stopped at the corner of Sixteenth and I think Fourth Avenue, next to a small shopping center, in the parking lot.
"Q. Would you describe the lighting of the parking lot, if any.
"A. It was a fairly well lit intersection, quite a few cars at that time of the night through that intersection. It is a busy area of town.
"Q. When you stopped there what happened next?
"A. He pulled in directly behind me and___
"Q. When you say "he," who are you referring to?
"A. Mr. Jensen.
"Q. Okay. Continue.
"A. I never seen the man before in my life, ever, from that at that time. I had gotten out of the car and I walked to the tail end, the bumper of my car; he got out of his car, walked to the front of his car, and I started to say something like: 'What seems to be your problem?' I never really got the sentence out___

"Q. Why?
"A. He said, 'I will teach you, you son-of-a-bitch.'
"Q. Then what did he do?
"A. He hit me on the side of the head with a wrench; I didn't know what it was at the time; I just saw a flash of metal___
"Q. What kind of a wrench—Do you know what kind of a wrench he hit you with?
"A. Later, it was a ten-inch crescent wrench.
"Q. Then what happened?
"A. I dropped to my knees. I don't know if he hit me one or two more times after that, but I managed to reach up and grabbed his arm and wrested the wrench away from him somehow or other. I tried hitting him a few times, and when we backed off, started scuffling and fighting, he tried to get back at the wrench, I backed off, and I said, 'Wait a minute,' I said, 'I don't want to fight you,' I said, 'I don't want any problems from you.'
"Q. How did he respond?
"A. He said something like, 'I ought to kill you,' or 'I will kill you.' He said, 'You almost killed me back there.' He said, 'I ought to kill you.' I said, 'I don't want any problem.' None of our cars were hurt. I said, 'forget it; go home; get out of here.' We started fighting again. He started coming at me. I kicked at him, started throwing some more punches, and I hollered at some cars, I said, 'Call the police; call the police.'
"Q. Did the police eventually arrive?
"A. Yes."

After the police arrived, Kontos was taken to the hospital in an ambulance.

Defense counsel particularly also objects to the fact that Kontos, when he appeared to testify, wore dark glasses and when questioned as to the reason for the glasses he stated that as a result of this altercation he has since suffered headaches and has a problem with the light hurting his eyes even in a darkened room.

Counsel for the defense concedes that a number of witnesses were called by the defense for the purpose of testifying to the good character of Jensen. He concedes that the general rule is that once the defense has opened the door in this manner, the prosecution can counter with evidence tending to rebut the character evidence of the defense [6] but that this does not permit the defense to introduce evidence of a specific instance of prior conduct of the defendant.

During the trial, the State argued that the evidence of the incident with Mr. Kontos should be admitted under Rule 405(b) of the North Dakota Rules of Evidence, which reads:

> "(b) *Specific instances of conduct.* In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."

It apparently was on that basis that the court permitted the evidence to be received.

Counsel for defense contends, however, that this is a misinterpretation of the purpose of Rule 405(b) inasmuch as the character of Jensen was not an essential element of any charge, claim, or defense in this case.

Counsel relies on encyclopedia authority.

> "The character of a person accused of a crime is not a fact in issue in a prosecution for such a crime, and the prosecution cannot, in its evidence in chief, for the purpose of inducing belief in the accused's guilt, introduce evidence tending to show his bad character or reputation, or that he has a tendency or disposition to commit the crime with which he is charged, unless, as hereinafter noted, the accused first introduces evidence of good character or reputation. Even though evidence of bad character and reputation may be logically relevant and of probative value, the courts, for sound reasons

of policy, hold that it is legally irrelevant. If such evidence was admissible, the deep tendency of human nature to punish, not because the accused is guilty, but because he is a bad man and may as well be condemned now that he is caught, would operate with the jury. The accused might be overwhelmed by prejudice, instead of being tried upon the evidence affirmatively showing his guilt of the specific offense with which he is charged." 29 Am.Jur.2d Evidence § 340.

The defense contends that the above quotation shows that the character of the accused is not an essential element of a prosecution charge or claim because the prosecution cannot even bring up the subject until the accused first raises the issue by introducing evidence of good character. Defense further submits that the introduction of character evidence is not an essential element of a defense and that it is not a defense at all. In support thereof, reference is made to the following:

> "Evidence of the good character and reputation of the accused in a criminal prosecution has the purpose and effect of strengthening the presumption of innocence, and where good character and reputation are established, an inference or presumption arises that the accused did not commit the crime charged. This view proceeds upon the theory that a person of good character and high reputation is not likely to have committed the act charged against him." 29 Am.Jur.2d Evidence § 339.

Defense asserts that the proper rule governing the admissibility of evidence in this instance is Rule 404(b), N.D.R.Ev.:

> "*Rule 404. Character Evidence Not Admissible to Prove Conduct, Exceptions: Other Crimes.*
>
> *        *        *        *        *        *
>
> "(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts

---

**6.** "The prosecution may introduce evidence attacking the character or reputation of the accused where he first puts his good character in issue by introducing evidence to sustain his good character or reputation. In other words, where the accused undertakes to strengthen his case by proof of good character, he opens the door to evidence by the prosecution that his character or reputation is, in fact, bad." 29 Am.Jur.2d Evidence § 340.

is not admissible to prove the character of a person in order to show that he acted in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Reliance is placed by the defense upon a recent decision of this court entitled *State v. Stevens*, 238 N.W.2d 251 (N.D.1975).

In *Stevens*, a man was convicted of beating an infant to death. During the trial, evidence was introduced tending to show that this man had previously inflicted injuries on the same infant. In reversing the conviction on the grounds that the evidence of prior acts was improperly admitted, we said:

"It is a general rule that evidence of prior acts or crimes cannot be received unless it is substantially relevant for some purpose other than to show a probability that a defendant committed a crime charged because he is a man of criminal character." 238 N.W.2d at 257.

For this general rule, we relied on McCormick on Evidence, 2d Ed., § 190 and *State v. Schlittenhardt*, 147 N.W.2d 118 (N.D. 1966).

Counsel points out that we have taken this position subsequently in *State v. Frye*, 245 N.W.2d 878 (N.D.1976); and *State v. Jelliff*, 251 N.W.2d 1 (N.D.1977). He refers us to decisions from other states upholding this principle. *State v. Forsman*, Minn., 260 N.W.2d 160 (1977); *State v. Pickering*, 88 S.D. 230, 217 N.W.2d 877 (1974); and *Harris v. State*, 52 Wis.2d 703, 191 N.W.2d 198 (1971).

The defense places particular emphasis upon the following quote:

"Once a defendant has placed his character in issue, it is proper for the prosecution to introduce evidence that the defendant's character is not as impeccable as is claimed. *People v. Mitchell*, 44 Mich.App. 679, 205 N.W.2d 876 (1973). However, where, as here, the defendant

puts his character in issue by proof of general reputation, the rebuttal testimony offered by the prosecution cannot be proven by showing specific bad acts by defendant, . . . ." *People v. Perez*, 66 Mich.App. 685, 239 N.W.2d 432, 436 (1976).

A part of the Wisconsin decision of *State v. Spraggin*, 77 Wis.2d 89, 252 N.W.2d 94 at 97 (Wis.1977), follows:

"Even if the evidence of other conduct is admissible under one of the exceptions, the trial judge must exercise his or her discretion to determine whether any prejudice resulting from such evidence outweighs its probative value."

The State responds to these arguments with its contention that the provisions of Rule 405(b) and Rule 404(b) of the North Dakota Rules of Evidence apply to sustain the trial court in the admission of this testimony in this case.

State asserts that the character or trait of character of the defendant which the State sought to have introduced pursuant to Rule 405(b) was his propensity for hostility and aggressiveness. The State asserts that in giving his version of the incident, Jensen implied that he was not the aggressor and in fact, acted only in self-defense.

The State asserts that upon raising the claim of self-defense, Jensen brought into focus the allegedly aggressive and hostile nature of the decedents.

The State points out that no specific aggressive or hostile acts by the decedents against Jensen were described or testified to by anyone, but from testimony submitted on behalf of the defense referred to earlier in this opinion, the jury might have concluded that the decedents were likely the aggressors in the instant case and that the defendant was not. In order to overcome that inference in conjunction with Jensen's claim of self-defense, the State asserts that it properly offered evidence of a trait of his character (apparently a quick and uncontrollable temper) to overcome the inference.

The State also asserts that the evidence which the State sought to have admitted relative to the altercation with Kontos in Minot was evidence which indicated, not that he was a criminal, but that he had a propensity for hostility and aggressiveness. The State asserts that evidence of such propensity might prove intent, knowledge, or absence of mistake or accident, and thus be admissible under Rule 404(b), N.D.R.Ev.

Our view is that the testimony submitted by the State through Kontos and Knoot would have been inadmissible under Rule 404(b), N.D.R.Ev., had it not been for the fact that the other acts involved in the altercation with Kontos were first brought out by the defense, and not only brought out first by the defense, but brought out in a light favorable to the defense. *See People v. Westek*, 31 Cal.2d 469, 190 P.2d 9 (1948).

We think also pertinent in this case, the fact that defense counsel was permitted not only to offer evidence of various traits of the character of the decedents, but was permitted to submit testimony of crimes and acts of the decedents such as the records of the decedents tribal court convictions for disorderly conduct, all under defense counsel's argument that Rule 404 of the North Dakota Rules of Evidence applied. All this was permitted in this case without first requiring the defendant to submit evidence that the victims' character for turbulence was known to the defendant. Such a prior showing is sometimes required before a victim's character or reputation for turbulence may be testified to. 1 A.L.R.3d

571 at 577. *But see*: 40 Am.Jur.2d Homicide, § 305.

Further, in light of the fact that the defense was permitted to offer evidence, over strenuous objection of the State, of specific acts of Vivier not a part of the res gestae and not connected therewith, through Deputy Sheriff Walford that Vivier caused fights when in jail by his homosexual advances, all contrary to the general rule that prohibits proof of specific acts of the deceased in a homicide case,[7] we believe that no prejudice was suffered by Jensen in this case.

We think that the facts in this case are so exceptional that they present a case necessitating an exception to Rule 404(b) of the North Dakota Rules of Evidence, and accordingly conclude that the trial court was not in error in permitting the testimony of Kontos and Knoot. In so concluding, we wish to stress that we are not, by this opinion, varying our support for the general rule applied and stated in *State v. Stevens, supra*, and the cases decided subsequent thereto in accordance therewith.

What we have approved today in permitting receipt of otherwise incompetent evidence, is something similar to what some courts have permitted and certain authorities have described as *fighting fire with fire*; or permitting receipt of incompetent evidence when the adversary has *opened the door*; or permitting receipt of incompetent evidence under the doctrine of *curative admissibility*. *See* McCormick on Evidence, 131 (2d Ed. 1972); 1 Wigmore, Evidence

---

7. "When evidence of the character or reputation for violence of the deceased is admissible in evidence, the proof is generally restricted to proof of the general reputation of the deceased in the community in which he or she lived, and excludes particular acts or instances which are not a part of the res gestae or connected therewith. In accordance with the policy of the law to confine the evidence to the issues on trial, it is the rule of some courts that the turbulent, violent, or bloodthirsty character of the deceased cannot be established by proof of specific acts of violence on his part against persons other than the defendant. Moreover, it may be

presumed that the general reputation of an individual in the community where he has lived is always susceptible of proof of defense, whereas nobody can be ready at a moment's notice to defend himself against accusations relating to particular transactions of his life. Clearly, evidence of specific acts of violence by the deceased is inadmissible where the defendant had no knowledge or had not been informed of such acts prior to the homicide, since, naturally, his mind could not have been materially affected in the absence of such knowledge." 40 Am.Jur.2d Homicide § 306.

§ 15; 31A C.J.S. Evidence § 190; 29 Am. Jur.2d, Evidence § 267; *State v. Mercer*, 13 Ariz.App. 1, 473 P.2d 803, 805 (1970); *Lucas v. State*, 479 S.W.2d 314, 315 (Tex.Cr.App. 1972); *Kroger Company v. Puckett*, Ala. Civ.App., 351 So.2d 582, 588 (1977); *Busch v. Busch Const., Inc.*, Minn., 262 N.W.2d 377 (1977).

For the reasons stated in this opinion, the verdicts, judgments and sentences in the two cases consolidated for trial and consolidated on appeal, are affirmed.

SAND, PEDERSON and PAULSON, JJ., and ILVEDSON, District Judge,* concur.

* ILVEDSON, District Judge, sitting in place of VANDE WALLE, J., disqualified.