STATE of North Dakota, Plaintiff
and Appellee,

v.

Ervin Alfred STEVENS, Defendant
and Appellant.

Cr. No. 523.

Supreme Court of North Dakota.

Dec. 31, 1975.

Charles J. Gilje, State's Atty., Stutsman County, Jamestown, for plaintiff and appellee State of North Dakota.

Vance K. Hill, Bismarck, for defendant and appellant.

VOGEL, Judge.

The defendant was convicted of the crime of first-degree manslaughter of Jonathan Whities, who was born on April 4, 1972, and died on June 2, 1974. The State contended that the defendant caused the death of Jonathan by beating. The evidence is circumstantial. In the main, it consists of evidence as to the injuries from which the child died, a showing that the injuries could have occurred during an eight-hour period when the defendant had charge of Jonathan and three other children, and that Jonathan had suffered prior injuries during other periods of time when the defendant was present and the mother of the child was not. However, the State also presented evidence of prior injuries which occurred when the defendant was not present. It also presented opinions of physicians that the fatal injuries were "not accidental," based in part upon evidence of all the injuries received, including those not attributable to the defendant. The principal question before us is whether the evidence of other injuries should have been received. Other questions include the propriety of receiving in evidence colored pictures of the child's injuries taken both before and after death, whether the defendant was entitled to discovery of certain photographs prior to trial, and whether the defendant preserved for appeal the question of sufficiency of the evidence.

From a lengthy record, we will attempt to abstract the facts in chronological order.

## PRELIMINARY FACTS AND PRIOR INJURIES

Jonathan's mother apparently was divorced. At various times, particularly the last

three months of 1973, and from early April 1974 until after Jonathan's death on June 2, 1974, the defendant lived with Jonathan's mother and her other children. During the three-month period in 1973 they resided at Sturgis, South Dakota, and during the 1974 three-month period they resided at Jamestown, North Dakota.

It appears to be the prosecution's contention that all the injuries to Jonathan occurred during the times when the defendant was living in the home where Jonathan lived; that some of the injuries occurred when the defendant was present and the mother was not; that others might have been caused by the defendant; and that evidence of all the injuries was admissible for consideration by the jury. We will list the various injuries, whether serious or trivial, in chronological order and then describe the relationship, if any, of the defendant to each of them.

1. On October 7, 1973, Jonathan was treated by Dr. George William Jenter, of Sturgis, South Dakota, for a laceration of the scalp requiring fourteen stitches to close. Dr. Jenter said he was told the child had fallen against an ashtray in a parked car. The mother testified that the injury occurred while the car was in motion, at a time when the mother and all of her children were passengers in a car driven by the defendant, who slammed on the brakes. There is no suggestion in the testimony that the injury was intentional.

2. On November 10, Jonathan was seen by Dr. Claude H. Dulaney, of Sturgis, South Dakota. Jonathan had bruises and injuries to his scrotum. He was hospitalized for five days, during which time the injury was treated with icepacks. His mother testified positively that the injury was due to a fall from a tricycle on a Sunday, at a time when she alone was caring for the children, and that the swelling first was noticed on the following Tuesday, the day Jonathan was taken to Dr. Dulaney. In response to a question from the State's Attorney, she said Jonathan could have received an injury between Sunday and Tuesday, but "not that I know of." There was no attempt whatever to link the injury to the defendant. In fact, the mother testified that he was "driving" when it happened. The defendant was employed at the time as an over-the-road trucker.

3. Dr. Jenter again saw Jonathan on December 10, 1973, in connection with a respiratory ailment. He noticed black-and-blue marks, which were attributed to a fall. Jonathan was found to have a low blood count and was given a prescription for it, but received no other treatment. No witness connected the defendant with this incident.

4. On December 15, 1973, Dr. Jenter saw Jonathan for a second laceration on the head. It required seven sutures to close. Jonathan also had multiple bruises, which the doctor photographed. Dr. Jenter was told that the laceration was caused by a fall against a heating register. The registers in the trailer where the family lived were flat on the floor, but the mother testified that the children often lifted them up and played with them. The fall occurred when the mother had left to make a phone call at her parents' home, and the defendant brought Jonathan to the parents' home immediately after it happened. The defendant was caring for the children at the time.

5. At the same visit, Dr. Jenter noticed black-and-blue marks over about 25 percent of Jonathan's body and took X-rays which showed seven rib fractures. The fractures were unsuspected and the X-rays were taken for the purpose of ascertaining the extent of the respiratory troubles from which Jonathan had been suffering for some time. There is no testimony to show the date of the rib injuries, except that no fractures were shown on the X-rays taken by Dr. Dulaney on November 10. The fractures presumably could have occurred at any time between November 10 and December 15.

6. Edna Barker, the mother of Jonathan's mother, said that Jonathan had fallen down the stairs at her house on an

unspecified date while the family was living in Sturgis. No treatment was given and no injury was noted.

7. Mrs. Barker testified to another scrotum injury on an unspecified date from an unspecified cause, also not treated by any physician. Although her testimony was unclear, she may have meant to say that the defendant was present when the injury occurred.

8. On May 20, 1974, Jonathan received black-and-blue marks while the defendant was babysitting him and the other children. The defendant reported that a motorcycle had fallen on Jonathan. He was seen by Dr. Edwin Hieb, of Jamestown, who found bruises on his hip and back, but no fractures. No treatment was necessary.

9. The next day, while Jonathan's mother was driving and the children were in the car, it was broadsided and damaged. No injuries were noted.

All the foregoing incidents, except Nos. 6 and 9, were put into evidence by the prosecution. A tabulation of the incidents, categorized according to the presence of the defendant and the presence of the mother, follows:

In presence of the defendant and in absence of the mother:

| | | |
|---|---|---|
| 4. | Laceration from register | December 15, 1973 |
| 7. | Untreated scrotum injury | 1973, no date specified |
| 8. | Motorcycle injury | May 28, 1974 |

In presence of the defendant and the mother:

| | | |
|---|---|---|
| 1. | Laceration from ashtray | October 7, 1973 |

In presence of the mother and in absence of the defendant:

| | | |
|---|---|---|
| 2. | Tricycle fall | November 10, 1973 |
| 9. | Auto collision | May 21, 1974 |

No indication as to whether either was present:

| | | |
|---|---|---|
| 3. | Bruises | December 10, 1973 |
| 5. | Fractured ribs | Between November 10 and December 15, 1973 |
| 6. | Fall downstairs | 1973, no date specified |

It will be noted that the only injuries which the evidence shows to have occurred in the presence of the defendant and in the absence of the mother are Nos. 4, 7, and 8, and two of them involved only bruises.

## EVENTS ON THE TWO DAYS PRECEDING DEATH

On Friday, May 30, the defendant and Jonathan's mother both worked, as they had been doing, from 5 p. m. to 1 a. m., he at the Wonder Bar and she at the Ramada Inn, in Jamestown. He quit his job that night, and went to the Ramada Inn about midnight. After she left work, at one o'clock, the two ate and returned home at about 2:30 a. m. The babysitter was taken home, and the mother checked the children to see if they were sleeping and covered up. The children seemed to be all right.

The next day, Saturday, the mother got up at 7:30 a. m. and looked in at the children, who appeared to be sleeping, and went to a beauty parlor where she stayed until 3:30 p. m. The children were in the charge of the defendant during the day. Two witnesses testified that he was upset because of the absence of the mother. When she got home, Jonathan was napping. Jonathan came out in a little while. He had vomited in his bed. He had two (older) black-and-blue marks on his forehead and a couple of fresh ones. She gave him aspirin and liquids, which he kept down, and he seemed to be better for a while. Then he acted as if it hurt to be lifted and his eyes began rolling.

Terry and John Christensen, a married couple who lived in the same apartment building, had dinner with Jonathan's mother and the defendant, and Terry was with them from about 3:30 on. About 7 p. m., Evangeline Nutt, who had been a practical nurse for about six years, was asked to look at Jonathan. His eyes were rolling less, but he was listless. There is some difference in the testimony as to whether she recommended hospitalization at this point. Later, she did.

About 9 p. m., the defendant, the mother, and the Christensens went to a bar, leaving the children with two babysitters. Before they had finished a drink, Evangeline Nutt came and told them the babysitters had said that Jonathan was worse. When they re-

turned to the apartment, Jonathan was playing a little, talking, and had better color. He was taken to the hospital, however, where he was examined by Dr. Edwin Hieb, who told the mother she could leave. They all went back to the bar and then to a restaurant, where they learned they were being sought to give consent to surgery. They then went to the hospital, where the defendant mentioned that a child had jumped on Jonathan.

The babysitters (one of whom had visited for a short time with the other while she was caring for the children on Friday night) were not sure of which events happened on Friday and which on Saturday, but they testified that on one or the other of the two nights Jonathan tripped while running and hit his head on the wall, and a seven-year-old child had jumped off the bed onto Jonathan's stomach. John Christensen testified that one of his children had hit Jonathan on the head with a piece of rocking chair.

Dr. Edwin Hieb found Jonathan to be listless, and that his eyes rolled but accommodated to light. His abdomen was distended. He transferred the case to Dr. Daniel Ratmasamy, a pediatrician. When X-rays showed air in the abdomen, Dr. Ratmasamy asked for surgery, which was performed by Dr. Evan Kostick and Dr. Robert Hieb.

During the surgery, the doctors found an almost complete severance of the small intestine. This was repaired under surgery, but the child died of shock and electrolyte imbalance the next day. He probably could have been saved if treatment had been given sooner. An autopsy was performed by Dr. Ralph Tarnasky.

The doctors testified that the bowel injury could have occurred within 24 hours of the examination [testimony of Dr. Kostick, who assisted Dr. Robert Hieb in the surgery] or from six or eight up to 18 or 24 hours [Dr. Robert Hieb]. They also found bruises, including some 24 to 48 hours old [Dr. Robert Hieb], not over a week old [Dr. Ratmasamy], or less than 36 hours old [Dr.

Tarnasky]. Dr. Tarnasky, during his autopsy, noted a brain injury more than two weeks and up to a year old, and a discolored scalp and superficial brain injury two or three days old at the longest. The X-rays showed a recent fracture of an ulna, one of the two bones of the forearm, and the older fractures of the ribs.

When asked questions as to whether the fatal injury was accidental or intentional, Dr. Tarnasky said that he could not say objectively, but "it looked like an awful lot of bruises." Dr. Edwin Hieb could come to no conclusion as to whether Jonathan had been beaten. Dr. Ratmasamy said that the blow to the stomach could have been accidental, but stated, "My conclusion would be, from all the data collected, the x rays and everything, I would not say it was an accident." Dr. Kostick had no opinion as to whether the injury was accidental or intentional. Dr. Robert Hieb was of the opinion that the fatal injury was not accidental, because some other injuries had taken place over a period of time, and he based his opinion on the "pattern of the injuries."

Dr. Kostick said it was possible to do the damage done to Jonathan by a person's jumping two or three feet down on him, and Dr. Edwin Hieb said the same, and that it was possible that the damage could be done by a 60-pound child's jumping on him.

It does not appear that the doctors were given any information as to how the rib fractures had occurred. It is obvious that they based their opinions in part upon the existence of the rib fractures. None based his opinion on the physical evidence as to the bowel damage alone.

The State argues that the fatal injury must have occurred Saturday afternoon, because two physicians testified that the child would not have slept well after an injury such as he received, and therefore the injury could not have occurred Friday when the jumping incident occurred. But we have noted that the babysitters' testimony was unclear as to which evening the jumping

incident occurred, and the medical evidence is that the injury could have occurred up to 36 hours before the examination Saturday night and that the child would sleep if exhausted. The doctors also testified that there would be a "lull" after the initial pain of the injury disappeared.

## ADMISSIBILITY OF OTHER ACTS OR CRIMES

■ It is a general rule that evidence of prior acts or crimes cannot be received unless it is substantially relevant for some purpose other than to show a probability that a defendant committed a crime charged because he is a man of criminal character. McCormick on Evidence, 2d Ed., § 190; *State v. Schlittenhardt*, 147 N.W.2d 118 (N.D.1966).

■ The State asserts that its evidence is within an exception to the general rule, allowing proof of other acts and offenses to show motive, intent, identity, scheme, or plan, and to show absence of mistake or accident. The exception is generally accepted in other courts. We have referred to some aspects of the exception in prior cases, e. g., *State v. Flath*, 61 N.D. 342, 237 N.W. 792 (1931), referring to motive, intent, and lack of accident or mistake. We agree with the State that the exception to the rule is part of the law of this State. The State asserts that the evidence in this case was offered to contradict the defense that the injuries were caused accidentally. It also appears that the State was using the proffered evidence to prove the corpus delicti (that is, the fact that a crime had been committed)[1] and to prove the identity of the person committing the fatal act.

The mere invocation of an exception to the rule does not end inquiry, however. It only begins it.

■ Not every similar act can be shown in evidence. There are limitations. Among them we will mention only three.

■ First, a much stricter showing of relevancy is required to prove identity or the doing of the criminal act by the accused, than when it is offered to prove knowledge, intent, or state of mind.[2] A typical example of the latter would be a case where the defendant admitted passing a forged instrument, but claimed lack of knowledge of its having been forged. In such a case, the passing of a number of similar instruments would tend to prove knowledge or intent.[3]

Second, the courts have often held that there must be substantial evidence of prior similar acts, or, as some courts put it, the evidence must be "clear and convincing."[4]

■ Third, before such evidence may be considered at all, there must be proof of commission of the crime charged. The jury was correctly instructed on this point by the court's giving of an instruction adapted from the second paragraph of North Dakota Jury Instruction 1316, as follows:

"Evidence of other acts of a like nature cannot be considered for any purpose, unless you first find that other evidence in the case, standing alone, establishes beyond a reasonable doubt that the defendant committed the particular act charged in the Information."

■ In the final analysis, the question before the court, trial or appellate, is one of balancing the aims of full disclosure and fairness to the defendant where they are in

---

1. The expression " 'corpus delicti,' as understood in homicide cases, means the body of the crime, and consists of two component parts, the first of which is the death of the person alleged to have been killed, and the second that such death was produced through criminal agency. [Citation omitted.]" *State v. Sogge*, 36 N.D. 262, 271, 161 N.W. 1022, 1023 (1917).

2. McCormick on Evidence, 2d Ed., § 190, p. 452.

3. *State v. Murphy*, 17 N.D. 48, 115 N.W. 84 (1908).

4. McCormick, *op. cit.*, § 190, pp. 451–452.

conflict. The basic question is fundamental fairness. *State v. Flath*, 61 N.D. 342, 237 N.W. 792 (1931). As McCormick says, the problem is not one of pigeonholing, but of balancing, of discretion rather than following a rule. He goes on to say:

" . . . problems of lessening the dangers of prejudice without too much sacrifice of relevant evidence can seldom if ever be satisfactorily solved by mechanical rules. And so here there is danger that if the judges, trial and appellate, content themselves with merely determining whether the particular evidence of other crimes does or does not fit in one of the approved classes, they may lose sight of the underlying policy of protecting the accused against unfair prejudice. The policy may evaporate through the interstices of the classification.

"Accordingly, some of the wiser opinions (especially recent ones) recognize that the problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

"Such a balancing calls for a large measure of individual judgment about the relative gravity of imponderables. Accordingly, some opinions stress the element of discretion. It should be recognized, however, that this is not a discretion to depart from the principle that evidence of other crimes, having no substantial relevancy except to ground the inference that accused is a bad man and hence probably committed this crime, must be excluded. The leeway of discretion lies rather in the opposite direction, empowering the judge to exclude the other-crimes evidence, even when it has sub-

stantial independent relevancy, if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. Discretion implies not only leeway but responsibility. A decision clearly wrong on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion." McCormick on Evidence, 2d Ed., § 190, pp. 453–454.

We have carefully examined the transcript and the entire record. We regret that the arguments of counsel were not reported and transcribed, so that we could examine the arguments of counsel to see what use was made in argument of evidence which we hold inadmissible.

■ After balancing the probative value of the evidence against its prejudicial effect in this case, we conclude that most of the evidence of other injuries should have been excluded. Our reasons may be briefly summarized: (1) The evidence is not really evidence of "other offenses or acts" of the defendant but, instead, is evidence of other injuries which individually might have been accidental or might have been caused by other persons; (2) The evidence is offered not only to prove absence of accidental causation but also to prove identity of the person causing the injury, which requires a higher degree of proof [see footnotes 2 and 3, *supra*]; (3) There is no direct evidence (as to any individual injury) that the defendant ever struck or abused Jonathan or any other child; (4) The evidence is such that the mother, just as well as the defendant, could be charged (and convicted).

■ After considering all of these factors, we have concluded that the evidence as to the other injuries, which surely has a tendency to stir the passions of a jury, has insufficient probative value to outweigh its prejudicial effect. We cannot say beyond a reasonable doubt that it did not affect the

verdict, and we therefore must reverse. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967); *State v. Hilling*, 219 N.W.2d 164, 172 (N.D.1974); *State v. Ghylin*, 222 N.W.2d 864 (N.D.1974).

If there were any substantial evidence that the defendant had exhibited a tendency toward child abuse, or if there were any direct evidence of his commission either of the act charged or of his having caused the prior injuries intentionally, or even if he were the only logical suspect, we might be more inclined to uphold the verdict, and on the authority of the cases cited by the State, *infra*, we might be able to do so. As the evidence stands, we cannot.

■■■ Specifically, evidence of prior acts or crimes or injuries to the decedent, not sufficiently connected to the defendant (Nos. 1, 2, 3, 5, and 7), should not have been offered or received for any purpose. The defendant's mere residence in the family home at the times when the injuries occurred, with opportunity to cause the injuries but no proof that he did so, is an insufficient basis for admission of the evidence.

■■■ Evidence of those injuries which occurred in the defendant's actual presence, if admitted in evidence, should be subject to a cautionary instruction as to the limited purpose for which it is received. [We do not reverse on this ground, since the cautionary instruction was not requested.]

We have examined the cases cited by the State in support of the admissibility of the evidence of other acts and offenses in this case. In none of them do we find the congeries of other events, related and unrelated, accidental and suspicious, we find in the record before us. See *Robinson v. United States*, 317 A.2d 508 (D.C.App.1974); *United States v. Woods*, 484 F.2d 127 (4th Cir. 1973); *United States v. Thomas*, 148 U.S.App.D.C. 148, 459 F.2d 1172 (1972); *State v. Bradford*, 259 La. 381, 250 So.2d 375 (1971); *People v. Brown*, 83 Ill.App.2d 411, 228 N.E.2d 495 (1967); *State v.*

*Hudson*, 521 S.W.2d 43 (Mo.App.1975); *Evans v. Commonwealth*, 215 Va. 609, 212 S.E.2d 268 (1975); *State v. Wright*, 66 N.J. 466, 332 A.2d 606 (1975).

In these cases cited by the State there was either direct evidence of the commission by the defendant of the act charged, or direct evidence of the other acts and crimes offered in evidence, or direct evidence of injuries to other children, or an admission by the defendant of some violence directed at the victim immediately prior to the death. None of them support the indiscriminate admission of evidence of other injuries without connection to the defendant except as to mere opportunity created by residing in the same home.

Our research discloses several cases which to some extent support the State's position. They include *People v. Henson*, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (1973); *State v. Silva*, 153 Me. 89, 134 A.2d 628 (1957); *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973); and *People v. Jackson*, 18 Cal.App.3d 504, 95 Cal.Rptr. 919 (1971). However, in each of these cases there was either a prosecution for a continuing offense such as child abuse, as to which other acts would be directly admissible in support of the charge, or there was sole custody and opportunity for only one person to have committed the act charged. In *State v. Loss*, there was evidence that the defendant fit the psychological profile of a "battering parent," evidence of which is not involved in the case before us.

In ruling that part of the evidence in the case before us should not have been admitted, we do not mean to deny the existence of the "battered child syndrome." We hold only that some of the evidence was on the far side of the line where prejudicial effect outweighs probative force.

## OTHER ISSUES

■■■ The State urges that the defense has not preserved on appeal the question of sufficiency of the evidence, because the de-

fense did not renew at the end of the entire case its motion for acquittal made at the end of the State's case. The record shows that the defense called only one witness, Jonathan's mother, and asked her only two questions. The first question inquired as to her name, and the second—a question as to whether any of the other children had said anything about how Jonathan's death occurred—was objected to and the objection was sustained. The defense then rested.

In *State v. Allen*, 237 N.W.2d 154 (N.D. 1975), we held that failure to renew a motion for acquittal at the end of the entire case is not a waiver of the right to acquittal upon a motion at the end of the State's case. The defendant therefore preserved his right to challenge the sufficiency of the evidence.

Since we remand for a new trial, we will deal briefly with other issues which may arise at the retrial.

I

■ The defense alleges error in the admission of color photographs of the body, taken at the inquest, with the incision made by the mortician covered. Although not cited by the parties, the controlling precedent in North Dakota is *State v. Iverson*, 187 N.W.2d 1 (N.D.1971), where we said, at page 37:

"It appears to be a well-settled rule that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question, are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, condition and identification of the body, even though such photographs may have the additional effect of tending to excite the emotions of the jury." [Citations omitted.]

■ We have examined the photographs received in evidence and find that the court was scrupulous in eliminating duplication and that the photographs received had evi-

dentiary value which far outweighed the slight emotional effect they might have created.

II

■ The defense complains that it was surprised by the production and offer of, and testimony as to, photographs taken in South Dakota which were not mentioned in a pretrial conference where the subject of photographs was discussed. At that conference, the only photographs mentioned by the prosecution, of which the defense was aware, were the autopsy photographs. The prosecution was ordered to provide copies to the defense. We believe it was implicit in the order of the court that all photographs, not just those described as autopsy photographs, were to be exhibited. The prosecution seems to take the position that it need produce evidentiary materials only if ordered by the court, or if the defendant had initiated discovery under Rule 16, N.D.R. Crim.P. These are not the only methods by which the defense can obtain discovery. See four methods described in *State v. Hilling, supra*, 219 N.W.2d 164, at 168–169.

■ In the present case, the defense failed to make timely objection to the evidence as to the South Dakota photographs, which were described by a witness before they were offered in evidence. When the offer was made, the defense objected and the exhibits were not received. No error was committed, in the absence of an objection as to the oral description by a witness of the photographs. If, upon retrial, the issue arises again, the defense will be entitled to the production of the evidentiary materials in advance of trial.

Reversed and remanded for new trial.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.