**Ardell DAHLEN, Plaintiff and Appellee,**

v.

**Philip LANDIS, Defendant and Appellant.**

Civ. No. 9973.

Supreme Court of North Dakota.

Dec. 22, 1981.

DePuy, Kopperud, Goulet & Hall, Grafton, for plaintiff and appellee; argued by Wallace R. Goulet, Jr., Grafton.

Shaft, McConn, Fisher & Thune, Grand Forks, for defendant and appellant; argued by John G. Shaft, Grand Forks.

PEDERSON, Justice.

Ardell Dahlen sought compensatory and punitive damages for personal injuries he received during an alleged roadside altercation with Philip Landis. Landis claims that he acted only in self-defense. The jury awarded Dahlen $67,800.00. Landis moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. Landis appealed from the order denying his motion. We affirm.

When the altercation occurred, Dahlen was a 39-year-old farm laborer, 5′11″ tall. He weighed approximately 220 pounds. Landis, a farmer, was 44 years old, 5′9″ tall, and weighed approximately 175 pounds. Somewhere in the background was a disputed claim by Dahlen that Landis owed him $75.00 in past due wages. Two Inkster area farmers, Ray Durkin and Tom Durkin, played minor roles in this saga.

On the night in question the two men, by happenstance, met at the Inkster Bar. According to Dahlen, Landis sprung from his bar stool as Dahlen walked by and "mumbled a bunch of words, something about wages." Dahlen testified that he became "quite scared" and suggested that they make a phone call to Ray Durkin to settle the wage dispute peacefully.

Landis, on the other hand, says that Dahlen approached him in the bar and brought up the subject of wages, and that Landis, not Dahlen, suggested the telephone call to Ray Durkin. Landis testified that Dahlen "told me he could take care of me." A witness called by Landis testified that Dahlen boasted to him of his ability to beat up Landis "anytime that he wanted to." In any event, there was no physical contact between Dahlen and Landis in the bar. After several phone calls the two men left the bar, and together headed easterly out of Inkster in Landis's pickup.

Dahlen said that a mile and one-half outside Inkster, Landis stopped the pickup on the edge of the road and ordered him to get out. Dahlen claimed that he "had no idea" why they stopped. He testified that he was standing near the side of the road when Landis delivered a "smashing blow" that knocked him into the ditch. Dahlen said that he tried to get up but Landis came after him "like a raging storm," screaming profanities and kicking and hitting him, perhaps 20 times. Dahlen testified that he feared for his life and begged Landis to stop. Finally, in Dahlen's words, the beating ended when Landis ordered him to stand up or face "more of that same punishment." Dahlen says he got back into the pickup, and Landis then drove several miles to Tom Durkin's farm where Dahlen was required to apologize to Durkin and "parade" in front of the headlights in order to show Durkin his injuries.

In contrast to Dahlen's contention that there was "very, very little conversation" in the pickup as they left the Inkster bar, Landis testified that Dahlen "hollered" at him and called him names. Landis and his wife, who spoke with her husband on the business band CB radio, both testified that Dahlen's protestations interfered with their conversation. Landis claimed that he stopped the pickup after Dahlen had threatened him. Landis explained that he jumped from the truck because he thought Dahlen "was gonna beat me up right in the cab." Landis claimed that he struck Dahlen only once in self-defense, out of fear.

After Dahlen and Landis returned to Inkster, Dahlen drove his own pickup to Fordville where he telephoned the sheriff. At

four o'clock the next morning Dahlen's uncle brought him to United Hospital in Grand Forks. Dahlen was hospitalized for nine days with a broken nose, broken finger, two broken ribs, black eyes and bruises on his arms, left hand, and shins. Medication for relief of pain and anxiety was prescribed.

Dahlen, who testified to a painful recovery, said he wore a "rib belt" for 30 days after his discharge from the hospital. He still had pains in his chest and was taking medication for anxiety at the time of the trial. Dahlen also testified that his endurance had greatly diminished, though he was engaged in farming activities at the time of trial. Dahlen said that he was humiliated and embarrassed by the assault.

The jury awarded Dahlen $2,800.00 in special damages (hospital, doctor, medical bills), $20,000.00 in general damages (pain, suffering, inconvenience, embarrassment and humiliation), and $45,000.00 in punitive damages.

## I.

A motion for judgment notwithstanding the verdict, made pursuant to Rule 50(b), NDRCivP, does not go to the weight of the evidence. Such motion should not be granted unless the moving party is entitled to judgment as a matter of law. *Vasichek v. Thorsen*, 271 N.W.2d 555, 559 (N.D.1978); *Chicago, M., St.P. & P. RR. Co. v. Johnston's Fuel Liners*, 130 N.W.2d 154, 157 (N.D.1964). The court must decide whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, reasonable men could reach but one conclusion as to the verdict. Otherwise stated, the court must decide whether the evidence, viewed most favorably to the party against whom the motion is made, and giving the party the benefit of all reasonable inferences from the evidence, compels a result with which no reasonable person might differ. *Nokota Feeds, Inc. v. State Bank of Lakota*, 210 N.W.2d 182, 187 (N.D.1973). And *see Kunze v. Stang*, 191 N.W.2d 526, 537 (N.D. 1971).

Landis claims that the evidence shows that he acted justifiably in self-defense and therefore the judge should have granted his motion. We disagree. When the evidence is viewed in the light most favorable to Dahlen, Landis is not entitled to a judgment as a matter of law. Reasonable people could differ as to whether or not Landis acted in self-defense. The trial court did not err in refusing to grant Landis's motion.

## II.

As one ground for his motion for a new trial, Landis asserted that both the compensatory and punitive damage awards were excessive. Rule 59(b)(5), NDRCivP. Considering the evidence of the viciousness of the beating, Dahlen's physical injuries and his fairly lengthy hospital stay, and Dahlen's pain, humiliation and anxiety, the trial court held that the $20,000 compensatory award was supported by the evidence.

The question of whether or not a new trial should be granted rests "almost entirely in the discretion of the trial court," *Kresel v. Giese*, 231 N.W.2d 780, 790 (N.D. 1975). We reverse an order denying a new trial only if a "manifest abuse of discretion" is shown. *Stee v. "L" Monte Industries, Inc.*, 247 N.W.2d 641, 645 (N.D.1976). Where the ground of the motion is passion or prejudice, this court has said that the trial court is to consider and weigh the evidence. *Cook v. Stenslie*, 251 N.W.2d 393, 395 (N.D.1977). We explained, however, that a verdict is excessive only if: the amount is so unreasonable and extreme as to indicate passion or prejudice on the part of the jury; the award is so excessive as to be without support in the evidence; or the jury verdict is so excessive as to appear clearly arbitrary, unjust, or such as to shock the judicial conscience. *Cook v. Stenslie, supra*, 251 N.W.2d at 396 (reviewing prior North Dakota cases) (citations omitted).

The weighing of the evidence by the trial court does not permit the court to substitute its judgment for that of the jurors. The determination of the amount of

damages is peculiarly within the province of the jury. Such determination rests largely in its discretion. *Johnson v. Monsanto Co.*, 303 N.W.2d 86, 92 (N.D.1981).

In *Unruh v. Murray*, 84 N.W.2d 730, 733 (N.D.1957), we held that the measure of damages for assault and battery is the detriment one party has suffered because of the unlawful act of another. Detriment means a loss or harm suffered in person or property. *Unruh, supra*. A review of the evidence, within the above guidelines, discloses that Dahlen suffered a brutal beating which left him with several broken bones (nose, finger, two broken ribs) and bruises. The picture he painted was of an unexpected assault in which Landis kicked him repeatedly, ignoring his pleas for mercy. A forced apology to Tom Durkin and a display of his injuries were also part of Dahlen's ordeal. Dahlen's nine-day hospital stay was marked by considerable discomfort; he was prescribed medications for sleep and for anxiety. His doctor testified that Dahlen visited his office several times during the month that followed his hospital stay, fretting about the possible effects of his injuries. Dahlen's dosage of tranxene, a drug designed to reduce anxiety, was doubled in December 1977. Dahlen testified that, "I can do probably half the work I used to do." Dahlen testified that he was humiliated and embarrassed because of the assault.

Is the award of $20,000 as compensation for the harm Dahlen suffered so unreasonable and extreme as to indicate passion or prejudice on the part of the jury? Is the award so excessive as to be without adequate support in the evidence? The trial court did not think that it was, nor do we. The jury may properly consider wounded feelings, mental suffering, humiliation, degradation, and disgrace in fixing compensatory damages. In an assault and battery action the victim ordinarily is entitled to recover for all bodily injuries and the attendant pain and suffering. 6A

C.J.S. Assault and Battery § 56. As we have said many times, the determination of damages for pain and suffering and comparable losses is not susceptible of an arithmetical calculation. Its ascertainment must, to a large degree, depend upon the common knowledge, good sense and practical judgment of the jury. *Lake v. Neubauer*, 87 N.W.2d 888, 891 (N.D.1958). The jury heard Dahlen's testimony and saw him on the witness stand. The trial court reviewed the evidence carefully and, with the advantage of having seen and heard the witnesses, concluded that there was sufficient evidence to sustain the jury's award of compensatory damages. We cannot say that the trial court abused its discretion in concluding that the $20,000 award of compensatory damages was not excessive.[1]

Landis also assails the $45,000 punitive damage award as excessive. Unlike compensatory damages, which are awarded to compensate a victim for his injuries, punitive damages are awarded when the wrongdoer's conduct has been oppressive, fraudulent or malicious. § 32–03–07, NDCC. The reason for awarding punitive damages is to punish the wrongdoer in order to deter him, and others, from repetition of the wrongful conduct. "An amount sufficient to serve this purpose in one instance might be wholly inadequate in another." *Neidhardt v. Siverts*, 103 N.W.2d 97, 103 (N.D.1960). Evidence of the defendant's wealth may properly be considered by the jury in fixing punitive damages. 6 Am.Jur.2d, Assault and Battery § 187.

"The social standing of the parties, the place where the assault occurs, the character of the persons present, the provocation, if any—all the circumstances—are to be considered. The question is not whether the trial court or this court, as triers of fact, would have awarded a less amount. Unless the verdict is so large as to clearly indicate that it must have been given under the influence of passion or

---

1. *Compare, Julson v. Loyal Order of Moose Number 822*, 140 N.W.2d 39 (N.D.1966), affirming an award of $7,000 compensatory damages in an assault and battery case, with *Unruh v.*
*Murray*, 84 N.W.2d 730 (N.D.1957), remitting, in an assault and battery action, a trial court award of $387.50 to $100 because of the minor nature of the plaintiff's injuries.

prejudice, it should stand." *Neidhardt, supra,* 103 N.W.2d at 103, quoting *Bogue v. Gunderson,* 30 S.D. 1, 137 N.W. 595, 596 (1912).

▮ To support an award of exemplary damages, the jury must find oppression, fraud, or malice, actual or presumed. *John Deere Company v. Nygard Equipment, Inc.,* 225 N.W.2d 80, 95 (N.D.1974). Malice in fact or actual malice relates to the actual state or condition of the mind of the person who did the act and is a question of fact upon the circumstances of each particular case to be found by the jury. *Neidhardt v. Siverts, supra,* 103 N.W.2d at 102. Presumed malice or malice in law, which also authorizes an award of exemplary damages, refers to that state of mind which is reckless with law and with the legal rights of the citizen in a person's conduct toward that citizen. *Shoemaker v. Sonju,* 15 N.D. 518, 108 N.W. 42, 44 (1906). Whether the defendant was guilty of oppression, fraud or malice, actual or presumed, is primarily a question for the jury. *Neidhardt, supra,* 103 N.W.2d at 102. While actual malice refers to the mental state of the party who committed the act, the law does not require direct evidence of such mental state; the character of the act itself, with all its surrounding facts and circumstances, may be inquired into for the purpose of ascertaining the motive or purpose which influenced the mind of the party in committing the act. Thus, upon the consideration of these, if that motive is found to be improper and unjustifiable, the law authorizes the jury to find it was malicious. *Neidhardt v. Siverts, supra.*

▮ The circumstances surrounding the assault and battery, including the suddenness of the attack, the profanity and the repeated blows delivered during the fight, authorized the jury to find that Landis acted maliciously. We do not think that the award of $45,000 punitive damages is so excessive as to appear clearly arbitrary or unjust. As with compensatory damages, the amount of punitive damages rests in the sound discretion of the jury. *Neidhardt, supra,* 103 N.W.2d at 103. Besides the evidence discussed above, there was testimony indicating that Landis's net worth is almost $1,000,000. Although we believe the award of $45,000 in punitive damages is ample, it is not, under the facts of this case, excessive.

Landis urges us to adopt the rule that punitive damages must be in reasonable proportion to the award of actual damages. In *Smith v. American Family Mut. Ins. Co.,* 294 N.W.2d 751, 764–766 (N.D.1980), we declined to embrace such a rule, deeming it inappropriate to the circumstances of the case. A survey of the case law and authorities appraising the rule has convinced us that it is an unnecessary addendum which provides little guidance in assessing punitive damage awards. For a collection of cases which are split on the point *see* Annot. 17 A.L.R.2d 527, and later case service. *And see* Dobbs, Handbook on the Law of Remedies, § 3.9 at 210. Tying the exemplary damages award to the amount of actual damages may defeat the punitive and deterrent objectives of exemplary damages. For instance, if a victim recovers only a small amount of actual damages the ratio rule requires a small punitive damage award regardless of the character of the wrongdoer's conduct. *See* Note, Punitive Damages and the Reasonable Relation Rule: A Study in Frustration of Purpose, 9 Pac.L.Rev. 823, 839–849 (1978). Likewise, the ratio rule comes into direct conflict with the well-established principle that the punitive award may properly vary with the defendant's financial circumstances; "one rule requires the proportioning of punitive award to the compensation granted, while the other requires the proportioning of the award to the defendant's ability to pay it." *See* Dobbs, *supra,* at 210–211. We are in agreement with Professor Dobbs' assessment of the rule:

"The purpose of the ratio rule is probably only to give the reviewing courts a strong hand in controlling potentially excessive punitive awards. However, for this purpose it is not needed, since the court is always free to declare that the punitive award is excessive, whether the

ratio rule is used or not. The actual application of the ratio rule in the courts suggests that, for the most part, courts merely use it as a handy expression for the idea that the punitive award in a particular case is excessive. Since no precise ratio is ever required, the rule is really not a rule at all, but only a general idea. It encourages an inflexible posture without adding any commensurate certainty in the law. It probably doesn't do much harm, but it is difficult to see that it does any good at all." Dobbs, *supra*, at 211.

We are convinced that our present law provides an adequate framework within which to judge whether a punitive award is excessive.

Landis has also argued that the jury verdict lacks sufficient evidentiary support. In view of the evidence discussed above, we do not think the trial court abused its discretion in denying the motion for a new trial on this ground.

### III.

■ The third question raised by this appeal is whether or not the trial court erred in refusing to admit evidence of other instances of hostility on the part of Dahlen.

When Landis took the stand, his attorney asked him if, prior to the incident, he had any knowledge that Dahlen was pugilistic. Landis stated that he knew of several violent encounters involving Dahlen; such information, according to Landis, was common knowledge in the area. Among other incidents Landis testified that Dahlen had threatened to shoot a prior employer, Clyde Fainsmith, over a wage dispute, and beat up one Emmet Best because he had posted his land. Landis also testified that his knowledge of these specific acts of hostility influenced his decision to defend himself.

Landis's lawyer then sought to call Emmet Best to testify that Dahlen had threatened him in the Inkster Bar a year earlier. The trial judge, after considering Rules

404(b), 608(b) and 405(b), North Dakota Rules of Evidence, ruled that the evidence was inadmissible.

Under Rule 404(b), N.D.R.Ev., evidence of other wrongs or acts is not admissible to show that a person acted in conformity therewith. Such evidence may be admitted, however, for other purposes, such as proof of motive, plan, or knowledge. Both here and at the trial court, Landis has argued that the evidence of specific instances should have been admitted under Rule 404(b) "to show that he had knowledge and possible reason to suspect that he might also be attacked."

Although Landis is correct in his contention that evidence of other acts is admissible for purposes other than to show that a person acted in conformity with his character, this does not end the inquiry under Rule 404(b). The rule does not authorize automatic admission merely because the proponent advances a proper purpose for the evidence; instead, the relevance and probative value of the evidence must be demonstrated. *See* 2 Weinstein's Evidence ¶ 404[08], n. 15 at 404–47, and ¶ 404[18] at 404–99–113. In *State v. Stevens*, 238 N.W.2d 251, 257–58, (N.D.1975), we held that, "in the final analysis," the key inquiry involved in ruling on the admissibility of "other acts" under Rule 404(b) is balancing the probative value of the evidence against its prejudicial effect. Quoting McCormick, we noted that "the problem is not one of pigeonholing, but of balancing, of discretion rather than following a rule." *State v. Stevens, supra*, 238 N.W.2d at 258.[2]

In excluding the evidence, the trial court carefully reviewed the other testimony bearing on Landis's knowledge of Dahlen's pugnacious propensities. The court noted Landis's testimony concerning various instances of violence, particularly the statement that he "considered" those incidents on the night in question. Reasoning that it is knowledge that is critical to a self-defense claim, and not the details of the "other acts," the trial court ruled that the evi-

---

2. Though *Stevens, supra*, is a criminal case, the requirement that the court assess the probative worth of the evidence is equally applicable in civil cases.

dence would be "time consuming and distractive to the main issue of this case." We do not think the court abused its discretion in excluding the "other acts" evidence under Rule 404(b).[3] Compare *State v. Jensen*, 282 N.W.2d 55, 65–69 (N.D.1979).

Likewise, the trial court did not err in ruling that the evidence is inadmissible under Rule 608(b), N.D.R.Ev. The rule plainly states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, . . . may not be proved by extrinsic evidence."

Finally, Landis argues that he should have been able to introduce the testimony under Rule 405(b). This rule permits specific instances of conduct to be used to prove character where character or a character trait is an "essential element of a charge, claim, or defense." Traditionally referred to as "character in issue," Rule 405(b) applies only when character or a character trait is an operative fact which, under the substantive law, determines the legal rights of the parties. 22 Wright and Graham, Federal Practice and Procedure § 5267 at 602. Scholars agree that true instances of character in issue are "rather rare." Wright and Graham, *supra*, § 5235 at 368, n. 3. Representative instances include chastity under a statute making chastity an element of the crime of seduction, and the competency of a driver in an action for negligent entrustment of a car to a careless driver. *See* Advisory Committee Notes to Federal Rule 404.

The question thus raised is whether or not the victim's character is an essential element of self-defense. Under the circumstances of this case, Dahlen's character was not "in issue" in the strict sense of Rule 405(b). The trial court did not err in excluding the evidence.

The state of mind of the defendant is the key to self-defense under our law. *Jahner v. Jacob*, 233 N.W.2d 791, 797 (N.D. 1975), *cert. denied*, 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975), citing *Julson v. Loyal Order of Moose Number 822*, 140 N.W.2d 39 (N.D.1966), sets forth the rule of law in civil cases:

> "Factors to consider in determining whether a person acted in self-defense . . . are the reasonableness of his belief [of being] in danger and the reasonableness of his belief of the need of the amount or degree of force used."

The proof of the character of the victim is relevant to show the fear of the victim in order to convince the jury of the reasonableness of the self-defensive acts. The known character of the victim for violence and turbulence is logically linked to the reasonableness of the belief that there was a need for self-defense. While some courts also admit such evidence to help determine which party committed the first act of aggression, Annot., *supra*, 91 A.L.R.3d 718 § 16(a) at 747, the use of character evidence in this fashion is forbidden by Rule 404(a). It is improper to conclude that the victim acted violently on this occasion from evidence that he acted violently on other occa-

---

**3.** Various other issues are implicated by the question of the admissibility of other violent acts of the plaintiff (victim) in an assault and battery action. For instance, many courts traditionally limited the method of proof to evidence of the plaintiff's reputation for turbulence; proof by specific instances of conduct was often prohibited. *See* Annot., 91 A.L.R.3d 718 § 14(c) at 742.

Rule 404(b), on the other hand, permits specific instances to be used to prove facts other than character. See 22 Wright and Graham, Federal Practice and Procedure, § 5266 at 595–596, and 2 Weinstein's Evidence, ¶ 405(02) at 405–15. With proof of specific instances authorized under Rule 404(b), a question raised is whether there should be any limits on what

may be proven. "Is the evidence to be limited to what the defendant has observed or heard of the acts? Or may details, beyond what has been seen or heard, be admitted?" Evidence—Self-Defense—Prior Acts of the Victim, 1 Wisc. L.Rev. 266, 274 (1974) (excellent article in criminal context).

A restriction to the defendant's belief of what happened seems advisable because it is his state of mind that is relevant; whether the incident ever occurred is immaterial. The requirement of a threshold showing of knowledge of the specific acts on the defendant's part has also been imposed by some courts. Annot., *supra*, § 16[c] at 751. As these issues are not essential to the disposition of this case, we leave their resolution for another day.

sions. In any event, neither use of the evidence can be justified on the ground that the victim's character is "in issue"; "the issue is clearly one of conduct." McCormick's on Evidence § 192 at 461 (2d ed.).

## IV.

Landis was initially charged with assault, a class C felony, in connection with the altercation. On February 23, 1978, the charge was reduced to a class B misdemeanor. Landis pled guilty to this charge. The judge deferred imposition of sentence for two years "to expire automatically 2/23/80." The records of the county court show that the charge has been dismissed. At the trial held from April 29–May 2, 1980, after the expiration of the deferred sentence, evidence of the guilty plea was admitted during cross-examination of Landis.[4]

Landis bases his objection to the admission of the guilty plea on certain provisions of Chapter 12–53, NDCC, and on Rule 410, N.D.R.Ev.

Under § 12–53–13, NDCC, the court having jurisdiction over a defendant who has been found guilty of a criminal offense may, in its discretion, suspend imposition of the sentence. The deferred imposition of sentence may be dependent on whatever conditions the court may impose. Section 12–53–13, NDCC. Whenever the imposition of sentence is suspended, the defendant is placed on probation under the control of the parole board. Section 12–53–14, NDCC. A defendant who fulfills the conditions of his probation may, under the aegis of § 12–53–

18, NDCC, "be permitted in the discretion of the court to withdraw his plea of guilty." The court may also, in its discretion, set aside the verdict. In either case, the court may then "dismiss the information . . . against such defendant, who shall then be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted." Section 12–53–18, NDCC.

Landis argues that inasmuch as the criminal charges against him were dismissed under the procedure described above, the provision of the section that he shall be released from "all penalties and disabilities resulting from the . . . crime of which he has been convicted" should have protected him from the admission into evidence in this civil action of the fact that he had pleaded guilty to the misdemeanor.

■ We do not agree. It has long been the law in North Dakota that a guilty plea in a prior criminal case is admissible in a subsequent civil suit arising out of the same factual situation as an admission. Such evidence is not conclusive, however, and may be explained. *Heid v. Shafer*, 140 N.W.2d 584, 587 (N.D.1966); *Borstad v. La-Roque*, 98 N.W.2d 16, 26 (N.D.1959). We do not think that the Legislature, in enacting § 12–53–18, NDCC, intended to obliterate the defendant's conviction for all purposes or to eradicate the fact that he has been finally adjudged guilty of a crime. This is made clear by the fact that § 12–53–19, NDCC, expressly provides that the prior conviction, even though it has been dis-

---

4. The evidence was employed in the following exchange:

"Q Now, as a result of that blow that you struck Mr. Dahlen with, did you also admit that to the crime of simple assault in Grand Forks County on February 23rd, 1978?

"MR. SHAFT: Objection, Your Honor.

"THE COURT: Objection is overruled.

"THE WITNESS: I just followed the advice of my attorney.

"Q (Mr. Goulet continuing) I didn't ask whether you followed the advice of your attorney. I said did you admit to the crime of simple assault.

"A Yes."

Landis then explained that he was not jailed on account of the plea, and that he was re-

leased without posting bond and without supervision. This exchange occurred on recross-examination:

"Q You were charged with, you say, aggravated assault?

"A Yes.

"Q Serious crime, isn't it?

"A I guess so.

"Q And your attorney was able to plea bargain the case for you to a misdemeanor.

"A Yes.

"Q And you—he was also able, in regard to your fine, to plea bargain that as well for you.

"A Yes."

missed, may be used in any subsequent prosecution. We do not agree that this constitutes an exclusive exception.

An opinion of the attorney general construing § 12–53–18, NDCC, to mean that there is no conviction after dismissal but that there may be instances when an individual should respond affirmatively to questions regarding his involvement in judicial proceedings also supports our view. 1972–74 N.D.Op.Att'y Gen. 191 (May 24, 1973). *Vaughn v. Jonas*, 31 Cal.2d 586, 191 P.2d 432, 438 (1948) (guilty plea dismissed under similar statute held admissible as an admission).

As the Ninth Circuit Court of Appeals noted in holding that an expunged conviction can be valid for other specific purposes:

"In this regard, it is important to recognize that a judicial expunction, like a pardon, is condonative in nature. It forgives a crime in order to advance a distinct social policy, but it in no way negates the correctness of the initial determination of guilt." *United States v. Potts*, 528 F.2d 883, 885 n. 4 (9th Cir. 1975).

*See, generally, People v. Sharman*, 17 Cal. App.3d 550, 552–553, 95 Cal.Rptr. 134 (1971), and cases cited therein. Compare *Blevins v. Department of Labor & Industries*, 21 Wash.App. 366, 584 P.2d 992 (1978).

Rule 410, N.D.R.Ev., does not apply to all "guilty pleas" but only to those that are "later· withdrawn." The question here is whether or not Rule 410 applies to a guilty plea that is withdrawn or set aside and the information dismissed pursuant to § 12–53–18, NDCC.

In holding that Rule 410, N.D.R.Ev., was inapplicable, the trial court noted that the rule applies to "pleas of guilty, withdrawn in the course of a plea agreement when the plea agreement may be rejected by the Court." The trial judge reasoned that the policy behind Rule 410 is to protect the plea bargaining process. He deemed such policy inapplicable to pleas withdrawn or set aside and dismissed pursuant to § 12–53–18, NDCC.

We agree with the trial court. While we realize that a suspended sentence may often be the end result of plea bargaining, the overriding policy behind Chapter 12–53, NDCC, is not to encourage the disposition of criminal cases by compromise, as is the case with Rule 410. *See* 23 Wright & Graham, Federal Practice and Procedure, § 5342 at 353. Rather, Chapter 12–53 invests the trial court with the power to mitigate punishment and confers upon it discretion in dealing with a convicted defendant. We think Rule 410 is designed, in the main, to exclude guilty pleas which are withdrawn pursuant to Rule 32(d), N.D.R. Crim.P. A guilty plea which is dismissed under § 12–53–18 is not barred by Rule 410 from admission in a subsequent civil suit.

Affirmed.

ERICKSTAD, C. J., and PAULSON, SAND and VANDE WALLE, JJ., concur.